1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAMONT SHEPARD,<br><br>        Plaintiff,<br><br>    v.<br><br>S. GANNON, *et al.*,<br><br>        Defendants. | Case No. 1:23-cv-01486-KES-EPG (PC)<br><br>FINDINGS AND RECOMMENDATIONS THAT THIS CASE PROCEED ON PLAINTIFF'S CLAIMS FOR EXCESSIVE FORCE AGAINST (1) OFFICER GANNON, (2) OFFICER LEVINSON, (3) SGT. CODY WILLIAMS, (4) OFFICER JESSE DIAZ, AND (5) OFFICER J. RIVAS; FOR RETALIATION AGAINST (1) OFFICER GANNON, (2) OFFICER LEVINSON, AND (3) LT. C. MARTINEZ; FOR CONSPIRACY AGAINST (1) OFFICER GANNON, (2) OFFICER LEVINSON, AND (3) LT. C. MARTINEZ; AND FOR DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS AGAINST NURSE SHANTEL REYNA; AND RECOMMENDING THAT ALL OTHER CLAIMS AND DEFENDANTS BE DISMISSED<br><br>OBJECTIONS, IF ANY, DUE WITHIN THIRTY (30) DAYS |

Plaintiff Lamont Shepard is a state prisoner proceeding *pro se* in this civil rights action filed pursuant to 42 U.S.C. § 1983.[1] Plaintiff's complaint, as amended, alleges that, after he assisted another inmate with a prison grievance, prison officials began mistreating him, including using excessive force against him, retaliating against him, and denying him medical care.

---

[1] Plaintiff has paid the filing fee and is thus not proceeding *in forma pauperis*.

1

Plaintiff's first amended complaint is now before the Court for screening. Upon review, the Court will recommend that this case proceed on the follow claims:

- for excessive use of force against (1) Officer Gannon, (2) Officer Levinson, (3) Sgt. Cody Williams, (4) Officer Jesse Diaz, and (5) Officer J. Rivas;
- for retaliation against (1) Officer Gannon, (2) Officer Levinson, and (3) Lt. C. Martinez;
- for conspiracy against (1) Officer Gannon, (2) Officer Levinson, and (3) Lt. C. Martinez; and
- for deliberate indifference to serious medical needs against Nurse Shantel Reyna.

The Court will further recommend that all other claims and Defendants be dismissed.

Plaintiff has thirty days from the date of service of these findings and recommendations to file his objections.

## I.    SCREENING REQUIREMENT

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint, or a portion of it, if the prisoner has raised claims that are frivolous or malicious, that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1), (2).

A complaint is required to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A plaintiff must set forth "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). The mere possibility of misconduct falls short of meeting this plausibility standard. *Id.* at 679. While a plaintiff's allegations are taken as true, courts "are not required to indulge unwarranted inferences." *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 681 (9th Cir. 2009) (citation and internal quotation marks omitted). Additionally, a

1  plaintiff's legal conclusions are not accepted as true. *Iqbal*, 556 U.S. at 678.

2      Pleadings of *pro se* plaintiffs "must be held to less stringent standards than formal

3  pleadings drafted by lawyers." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (holding that

4  *pro se* complaints should continue to be liberally construed after *Iqbal*).

5  **II.   BACKGROUND**

6      Plaintiff filed his initial complaint on October 18, 2023. (ECF No. 1). On January 29,

7  2024, Plaintiff filed a first amended complaint. (ECF No. 14); *see* Fed. R. Civ. P. 15(a)(1).

8      Plaintiff thereafter filed multiple requests to amend his complaint to add new claims and

9  Defendants, without attaching a proposed amended complaint. (ECF Nos. 15, 19). The Court

10 repeatedly explained to Plaintiff that all his allegations and Defendants must be contained

11 within a single document—meaning, he cannot simply add to an earlier complaint by filing a

12 later document—and gave Plaintiff leave to file an amended complaint. (ECF Nos. 11, 16).

13     After Plaintiff again filed a request to add defendants to his pending complaint, the

14 Court issued an order stating:

15     Plaintiff has filed a motion to amend his complaint on March 13, 2024 (ECF No.
       19 ), which once again asks for permission to add several defendants to his
16     current complaint without including a proposed amended complaint. As the
       Court has repeatedly explained (ECF Nos. 11 , 16 ), Plaintiff must submit a
17     proposed complaint that is complete in full along with any motion for leave to
       amend his complaint. It is not proper to ask that defendants be added to the
18     current complaint. Local Rule 137(c). Plaintiff has now filed three similar
       requests (ECF Nos. 15 , 17 , 19 ) that all ask that defendants be added without
19     attaching a proposed amended complaint. At this point, the case either needs to
       proceed on the currently pending First Amended Complaint, filed January 29,
20     2024 (ECF No. 14 ), or Plaintiff must file a motion for leave to amend ALONG
       WITH a proposed second amended complaint that is complete without any
21     reference to an earlier complaint. Accordingly, the Court **DENIES** Plaintiff's
       motion. (ECF No. 19 ). The Court will give Plaintiff 30 days to file a motion for
22     leave to amend the complaint that includes a **complete** proposed Second
       Amended Complaint. If within that time Plaintiff files a motion for leave and
23     proposed second amended complaint, the Court will screen that second amended
       complaint. If Plaintiff fails to do so within 30 days, or once again asks to add
24     defendants without providing a proposed amended complaint in its entirety, the
       case will proceed on Plaintiff's First Amended Complaint (ECF No. 14 ), which
25     will be subject to screening by the Court.

26 (ECF No. 21).

27

28

On March 22, 2024, Plaintiff filed a notice to proceed on his first amended complaint. (ECF No. 22). Accordingly, the Court will review Plaintiff's first amended complaint without reference to any other document that was filed.

### III.   SUMMARY OF PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff's First Amended Complaint alleges as follows:

**November 9, 2020**

On November 9, 2020, while Plaintiff was incarcerated at California Correctional Institution (CCI), Plaintiff noticed food items in the hands of Officers Gannon and Meza during a cell search. Some of the items belonged to Inmate Hearn, who had just purchased them from commissary, and Plaintiff told Inmate Hearn that he saw Officers Gannon and Meza with the items.

Inmate Hearn asked Plaintiff to help him file a 602 grievance and Plaintiff agreed. Lt. C. Martinez held a hearing on December 29, 2020, and Plaintiff was a witness for Inmate Hearn. Officer Gannon "did not like that" and informed Plaintiff that he was "go[ing] to get [him.]"

Plaintiff told Lt. C. Martinez about Gannon's threat, and Lt. C. Martinez told Plaintiff to "drop a knife," which means to "write it down, then drop it for an officer to find." Plaintiff asked why would he have to do that when he is telling Lt. C. Martinez about the threat. Lt. C. Martinez responded, "It is what it is, if you got that coming so be it." Plaintiff then told Lt. C. Martinez about the incident regarding Inmate Hearn's property and went back to his cell.

**January 6, 2021**

Plaintiff alleges that, on January 6, 2021, Officer Gannon "acted on his threat," along with House Unit Officer S. Levinson, who left "his post to commit this crime." Specifically, Plaintiff was making food and then went to look out of "the cell door" as it began to open "to see what was going on." He was then sprayed with "OC pepper spray," and "one of the officers yelled, 'Payback nigger,'" during the spraying. Plaintiff states that, after the spraying stopped, he noticed the two officers inside the cell. He placed both officers in a headlock, being unsure as to which one sprayed him.

Once Plaintiff saw a spray cannister in Officer Gannon's hand, he released Officer Levinson and defended himself against Gannon. Plaintiff describes in detail the resulting struggle between him and the officers. Most pertinent here, Officer Levinson sprayed Plaintiff in the face with pepper spray, and Plaintiff hit both Officers, although he maintains it was in self-defense.

According to Plaintiff, after he eventually subdued both Officers, he went to the shower to wash the pepper spray from his eyes. When he was finished, he walked to the dayroom stairs.

Other officers entered the section, and Plaintiff stopped and "proned out," which the Court understands to mean that Plaintiff laid flat on the ground. Correctional Officer J. Rivas placed Plaintiff in handcuffs and applied leg irons. Plaintiff was escorted to the rotunda, where Sgt. Cody Williams struck Plaintiff in the face and kicked him, Officer Jesse Diaz kicked Plaintiff in the head and back, Officer Gannon kicked Plaintiff in the face, and Officer J. Rivas kicked Plaintiff in the head and back.[2]

Plaintiff was picked up off the ground and escorted to medical. Nurse Shantel Reyna refused to treat him because she claimed that he had attacked an officer. Plaintiff states that he had the following injuries from the attack: the left side of his nose was broken, the left side of his face was swollen, his mouth was busted, the back of his head was busted (which required staples to close), and he sustained a concussion.

**January 7, 2021**

Plaintiff asserts that a "use of force video" was conducted by Lt. C. Martinez on January 7, 2021. Lt. C. Martinez told Plaintiff that he instructed Officer Gannon to use force against Plaintiff for the complaint made by Inmate Hearn. Lt. C. Martinez threated Plaintiff, stating that if he did not rescind his statement about being attacked in the rotunda and the injuries he suffered, he would attack Plaintiff again. He stated that, "They will be back."

To make "good on his promise," Lt. C. Martinez returned with seven unnamed officers,

---

[2] Plaintiff says that other officers punched and kicked him; "however, their names are not noted." (ECF No. 14, p. 6).

plus two unnamed officers who escorted Plaintiff. Lt. C. Martinez stated, "You remember what I said?" He then showed Plaintiff the video of him being attacked in order to scare Plaintiff. Then Lt. C. Martinez stated, "So we clear right?" Plaintiff responded, "Clear." Then Lt. C. Martinez started a recorder and Plaintiff stated, "No, my nose is broke and I was attacked by the officers in the rotunda via the video and transcript." Plaintiff was then escorted back to his assigned cell.

On January 14, 2021, Plaintiff was seen by the Institution Committee, with "the counselor" informing him that his charge of battery was going to be changed to "attempted murder." Plaintiff told the Committee that he was defending himself from an attack. Plaintiff indicates that this incident led to his transfer to Kern Valley State Prison (KVSP) on January 14, 2021.

**January 27, 2021**

While at KVSP on January 27, 2201, Plaintiff was informed by Office L. Martinez[3] that he had a "lab" due to COVID-19. Plaintiff refused because "it was not a hospital setting." Plaintiff states that on January 28, 2021, he was asked by a nurse to give blood but he refused. Plaintiff visited Dr. Wang, presumably to check his injuries, but Dr. Wang asked, "So you don't want to give blood?" Plaintiff asked Dr. Wang what it was for, and Dr. Wang said it was for "high blood pressure." Plaintiff told Dr. Wang that he could check his blood pressure with a machine, but Dr. Wang stated, "No, you have not given blood in a long time." Plaintiff informed Dr. Wang that he had given blood on January 6 or 7 of 2021.

Two unnamed Investigative Service Unit (ISU) officers walked up and spoke with the officer sitting outside of the doctor's office. Plaintiff asked if they were for him. The officer stated, "yes," and Plaintiff was escorted into an interview room. The officers informed him that they received a call from CCI and they needed Plaintiff's blood. Plaintiff asserts that Dr. Wang was "complicit" in a scheme by CCI to obtain his blood without a doctor's order. He alleges that the unnamed officers threatened to use force if he did not comply, but he refused anyway.

---

[3] Officer L. Martinez is a different person than Lt. C. Martinez mentioned elsewhere in the complaint.

Plaintiff appears to indicate that CCI Warden, Officer Gannon, and Officer Levinson instructed the two ISU officers to obtain his blood.

Plaintiff states that an ISU officer said they needed his blood to mix it with "the guy's blood" and that the officers had a court order and would use force if Plaintiff refused. Plaintiff engaged in a back in forth with the officers about whether they actually had a court order.

Officer Sims came to Plaintiff's cell and advised Plaintiff that the Warden at KSVP told Plaintiff that he would have to give blood or else force would be used but Plaintiff refused. An officer did a security check later on Plaintiff and he requested a 602 complaint form.

Plaintiff went on a hunger strike to bring attention to this issue and there was a hearing. Plaintiff then recalls various steps in the grievance process. Plaintiff appears to indicate that the grievance process led to him identifying the two ISU officers discussed above as (1) Institutional Gang Investigator (IGI) Lt. Molina and (2) ISU Officer Hunt. He names them as Defendants "for being complicit into the actions of CCI Warden, Officer Gannon, and Officer Levinson, and for . . . attempting to obtain [his] blood illegally."

Plaintiff indicates that he later discovered that CCI had wanted to see if Plaintiff would voluntarily provide a blood specimen due to a CCI Officer receiving an injury related to a rule violation report (RVR) for the act of "attempted murder" to identify if Plaintiff had any communicable diseases. Plaintiff states that Officer Levinson did not have an "injury consistent with drawing blood," and in any event, both he and Levinson gave "blood at the outside hospital to make sure [they] did not have COVID-19 or any communicable diseases." Plaintiff indicates that, during the grievance process, officers denied that they had ever threatened him about giving a blood sample.

Plaintiff indicates that the incident with Officer Levinson ultimately resulted in a criminal trial for attempted murder, and he was found not guilty of this offense on October 5, 2023.

**July 16, 2023**

Plaintiff states that, in advance of his criminal trial for the attempted murder of Officer

7

Levinson, he was transported to CCI.[4] Upon arrival, Defendant T. Burns approached the cell Plaintiff was in (B-Section, Cell 105) and mouthed, "We go get you," in reference to the January 6, 2021 incident. Plaintiff asserts that this "mere threat of harm is actionable."

Plaintiff states District Attorney Jamila Ha prosecuted his case "knowing what the officers did by video evidence and claimed said didn't happen, being complicit into the actions of Defendants Gannon, Levinson, [and] the Warden of CCI Tehachapi."

Plaintiff generally indicates the unnamed officials at CCI are retaliating against him by refusing to hear his RVR "to keep the attempted murder on file" and to generally keep him under close supervision.

**October 4, 2023**

Plaintiff states that, while being transported on October 4, 2023, to court, he was threatened by CCI Officer Munoz,[5] who stated, "If not for the cameras we will kill this nigger." He asserts that Officer Pena claimed to have reported this statement to the sergeant, but Officer Pena did not do so, and was thus "complicit" in Munoz's actions.

Plaintiff said that he appealed this incident to CCI's Warden and to the CDCR but indicates that they claimed that the incident did not happen. Thus, they are complicit.

## IV.   ANALYSIS OF PLAINTIFF'S COMPLAINT

### A.   Section 1983

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see*

---

[4] Plaintiff states that he was transported to Tehachapi State Prison. The Court presumes he means, CCI, which is located in Tehachapi.

[5] Plaintiff also spells the name as "Munozes." The Court uses Munoz for consistency.

8

*also Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 618 (1979); *Hall v. City of Los Angeles*, 697 F.3d 1059, 1068 (9th Cir. 2012); *Crowley v. Nevada*, 678 F.3d 730, 734 (9th Cir. 2012); *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006).

To state a claim under § 1983, a plaintiff must allege that (1) the defendant acted under color of state law, and (2) the defendant deprived him of rights secured by the Constitution or federal law. *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006); *see also Marsh v. County of San Diego*, 680 F.3d 1148, 1158 (9th Cir. 2012) (discussing "under color of state law"). A person deprives another of a constitutional right, "within the meaning of § 1983, 'if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made.'" *Preschooler II v. Clark County Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)). "The requisite causal connection may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms." *Preschooler II*, 479 F.3d at 1183 (quoting *Johnson*, 588 F.2d at 743). This standard of causation "closely resembles the standard 'foreseeability' formulation of proximate cause." *Arnold v. Int'l Bus. Mach. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981); *see also Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008).

A plaintiff must demonstrate that each named defendant personally participated in the deprivation of his rights. *Iqbal*, 556 U.S. at 676-77. In other words, there must be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by the plaintiff. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691, 695 (1978).

Supervisory personnel are not liable under § 1983 for the actions of their employees under a theory of *respondeat superior* and, therefore, when a named defendant holds a supervisory position, the causal link between the supervisory defendant and the claimed constitutional violation must be specifically alleged. *Iqbal,* 556 U.S. at 676-77; *Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979); *Mosher v. Saalfeld*, 589 F.2d 438, 441 (9th Cir.

1978). To state a claim for relief under § 1983 based on a theory of supervisory liability, a plaintiff must allege some facts that would support a claim that the supervisory defendants either: were personally involved in the alleged deprivation of constitutional rights, *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989); "knew of the violations and failed to act to prevent them," *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); or promulgated or "implement[ed] a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation," *Hansen*, 885 F.2d at 646 (citations and internal quotation marks omitted).

For instance, a supervisor may be liable for his or her "own culpable action or inaction in the training, supervision, or control of his [or her] subordinates," "his [or her] acquiescence in the constitutional deprivations of which the complaint is made," or "conduct that showed a reckless or callous indifference to the rights of others." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (citations, internal quotation marks, and brackets omitted).

### B.    Eleventh Amendment Immunity

As an initial matter, Plaintiff identifies the CDCR as a defendant in this case, stating that it "is complicit into the action of [its] officers." (ECF No. 14, p. 15).

> The Eleventh Amendment bars suits which seek either damages or injunctive relief against a state, an arm of the state, its instrumentalities, or its agencies. However, *Ex Parte Young*, the Eleventh Amendment does not bar actions seeking only prospective declaratory or injunctive relief against state officers in their official capacities.

*Fireman's Fund Ins. Co. v. City of Lodi, Cal.*, 302 F.3d 928, 957 n. 28 (9th Cir. 2002) (citations and internal quotation marks omitted). Additionally, the Eleventh Amendment does not bar suits seeking damages against state officials in their individual capacities. *Hafer v. Melo*, 502 U.S. 21, 30-31 (1991).

Noting in Plaintiff's complaint appears to fall within the *Ex Parte Young* exception. Accordingly, as the CDCR is a state agency, it is entitled to Eleventh Amendment immunity from Plaintiff's claims. *Est. of Sumner v. California Dep't of Corr. & Rehab.*, No. 2:22-CV-01638-JAM-DB, 2023 WL 3304233, at *2 (E.D. Cal. May 8, 2023) ("CDCR did not waive, nor has Congress abrogated, its immunity under the Eleventh Amendment. In turn, the Eleventh

Amendment unequivocally precludes Plaintiffs claims against CDCR. The Court therefore finds Plaintiffs failed to state a plausible cause of action against CDCR and dismisses their claims accordingly.").

Further, as the Court informed Plaintiff in its February 26, 2024, order denying leave to amend, "[s]tate agencies and prisons are also not 'persons' within the meaning of § 1983, and therefore cannot be subject to suits for violation of Plaintiff's constitutional rights." (ECF No. 16, p. 2) (citing *Maldonado v. Harris*, 370 F.3d 945, 951 (9th Cir. 2004)).

Accordingly, the Court recommends dismissing Plaintiff's claims against CDCR.

## C.      Excessive Force

Plaintiff's includes allegations of "unnecessary force" regarding the January 6, 2021 incident—during which various officers allegedly struck him without cause. (ECF No. 14 p. 2).

"In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not . . . use excessive physical force against prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "[W]henever prison officials stand accused of using excessive physical force in violation of the [Eighth Amendment], the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).

When determining whether the force was excessive, the court looks to the "extent of injury suffered by an inmate . . . , the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Id. at* 7 (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)). While *de minimis* uses of physical force generally do not implicate the Eighth Amendment, significant injury need not be evident in the context of an excessive force claim, because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Id.* at 9.

Here, Plaintiff alleges that Officer Gannon threatened to "get him" after he acted as a

witness on behalf on Inmate Hearn after Gannon confiscate Hearn's food items. Thereafter, Gannon and Officer Levinson (who was allegedly outside of his post) attacked him with pepper spray and without justification, with one of the officers yelling, "Payback nigger."

Additionally, Plaintiff alleges that, after he was placed in handcuffs and leg irons, Sgt. Cody Williams, Officer Jesse Diaz, Officer Gannon, and Officer J. Rivas each struck him (*e.g.*, by kicking him in the face) resulting, among other injuries, in a broken nose.

With the above standards in mind, the Court concludes, for the purposes of screening, that Plaintiff has sufficiently stated claims for excessive use of force against (1) Officer Gannon, (2) Officer Levinson, (3) Sgt. Cody Williams, (4) Officer Jesse Diaz, and (5) Officer J. Rivas.

### D. Retaliation

Plaintiff includes allegations of "retaliation" by Officers Gannon and Levinson regarding the January 6, 2021 incident in which they purportedly committed an unprovoked attack on him based on his helping Inmate Hearn with grievance proceedings and complaining to Lt. C. Martinez about Gannon's threat. (ECF No. 14 p. 8). Additionally, he states that Lt. C. Martinez told him that he was the one who "instructed [Officer] Gannon to use force against [him] for the complaint made by Inmate Hearn." (*Id.* at 6).

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005) (footnote and citations omitted). To prevail on a retaliation claim, a plaintiff may "assert an injury no more tangible than a chilling effect on First Amendment rights." *Brodheim v. Cry*, 584 F.3d 1262, 1269-70 (9th Cir. 2009). Furthermore, "a plaintiff does not have to show that 'his speech was actually inhibited or suppressed,' but rather that the adverse action at issue 'would chill or silence a person of ordinary firmness from future First Amendment activities.'" *Id.* at 1271 (citing *Rhodes*, 408 F.3d at 568–69) (emphasis in original). "Evidence of his motive

may include: (1) proximity in time between the protected conduct and the alleged retaliation; (2) defendant's expressed opposition to the protected conduct; and (3) other evidence showing that defendant's reasons for the challenged action were false or pretextual." *Barth v. Montejo*, No. 2:19-CV-1874 DB P, 2020 WL 73407, at *2 (E.D. Cal. Jan. 7, 2020).

While prisoners have no freestanding right to a prison grievance process, *see Ramirez v. Galaza,* 334 F.3d 850, 860 (9th Cir. 2003), "a prisoner's fundamental right of access to the courts hinges on his ability to access the prison grievance system," *Bradley v. Hall,* 64 F.3d 1276, 1279 (9th Cir. 1995), *overruled on other grounds by Shaw v. Murphy,* 532 U.S. 223, 230 n.2 (2001). Because filing administrative grievances and initiating civil litigation are protected activities, it is impermissible for prison officials to retaliate against prisoners for engaging in these activities. *Rhodes,* 408 F.3d at 567; *Uribe v. McKesson*, No. 08CV01285 DMS NLS, 2011 WL 9640, at *12 (E.D. Cal. Jan. 3, 2011) ("An inmate's reporting of officer misconduct, or the attempt to do so verbally or in writing, constitutes speech or conduct entitled to First Amendment protection."). Moreover, some courts have held that assisting other inmates with grievances is protected conduct. *See Holman v. Sauceda*, No. 5:18-CV-00502-DOC (MAA), 2019 WL 8108722, at *7 (C.D. Cal. Dec. 16, 2019), *report and recommendation adopted*, 2020 WL 2951123 (C.D. Cal. Jan. 23, 2020) (allowing case to proceed on retaliation claim based on an inmate assisting other inmates with filing grievances). *But see Freeman v. Lyons*, No. 5:14-CV-2350-DSF-GJS, 2016 WL 750434, at *4 (C.D. Cal. Jan. 8, 2016), *report and recommendation adopted*, 2016 WL 756463 (C.D. Cal. Feb. 25, 2016) (questing whether there "is a freestanding right against retaliation for engaging in First Amendment protected activity by assisting an inmate in filing a grievance").

Here, Plaintiff alleges that, after he assisted Inmate Hearn in filing a grievance against Officer Gannon for taking Hearn's food items and acted as a witness on Hearn's behalf, Gannon informed him that he was "go[ing] to get [him]." Thereafter, Plaintiff complained to Lt. C. Martinez about Gannon's threat. However, Martinez told Plaintiff to write it down and "drop it for an officer to find." (ECF No. 14, p. 2). When Plaintiff asked why he would need to do this when he was informing Martinez right then, Martinez responded, "It is what it is, if you

got that coming so be it." And as discussed above, on January 6, 2021, Plaintiff alleges that Officers Gannon and Levinson committed an unprovoked attack on Plaintiff, with one of them yelling, "Payback nigger," while spraying him with pepper spray. (*Id.* at 3.). And on January 7, 2021, Lt. C. Martinez told Plaintiff that he had "instructed [Officer] Gannon to use force against [Plaintiff] for the complaint made by Inmate Hearn." (*Id.* at 6).

With the above standards in mind, the Court concludes, for the purposes of screening, that Plaintiff has stated claims for retaliation against (1) Officer Gannon, (2) Officer Levinson, and (3) Lt. C. Martinez.

### E.    Conspiracy

Plaintiff's allegations regarding that attack by Officers Gannon and Levinson and Lt. C. Martinez's purported orchestration of the attack reasonably implicate conspiracy claims.

To state a claim for conspiracy under § 1983, Plaintiff must show the existence of an agreement or meeting of the minds to violate constitutional rights, *Avalos v. Baca*, 596 F.3d 583, 592 (9th Cir. 2010); *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2001), and that an "actual deprivation of his constitutional rights resulted from the alleged conspiracy," *Hart v. Parks*, 450 F.3d 1059, 1071 (9th Cir. 2006) (quoting *Woodrum v. Woodward County, Oklahoma*, 866 F.2d 1121, 1126 (9th Cir. 1989)). "'To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy.'" *Franklin*, 312 F.3d at 441 (quoting *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir.1989)). Additionally, Plaintiff must present evidence that Defendants "conspired or acted jointly in concert and that some overt act [was] done in furtherance of the conspiracy." *Sykes v. State of California*, 497 F.2d 197, 200 (9th Cir. 1974).

Here, Plaintiff alleges that, after he assisted Inmate Hearn in grievance proceedings, Officer Gannon threatened to get him. Thereafter, Plaintiff complained to Lt. C. Martinez about Gannon's threat but, rather than respond directly, Martinez told Plaintiff to write it down and "drop it for an officer to find." (ECF No. 14, p. 2). When Plaintiff asked why he would need to

do this when he was informing Martinez right then, Martinez responded, "It is what it is, if you got that coming so be it."

As discussed above, on January 6, 2021, Officers Gannon and Levinson committed an unprovoked attack on Plaintiff, with one of them yelling, "Payback nigger," while spraying him with pepper spray. (*Id.* at 3.). And on January 7, 2021, Lt. C. Martinez told Plaintiff that he had "instructed [Officer] Gannon to use force against [Plaintiff] for the complaint made by Inmate Hearn." (*Id.* at 6).

With the above standards in mind, the Court concludes, for the purposes of screening, that Plaintiff has stated claims for conspiracy against (1) Officer Gannon, (2) Officer Levinson, and (3) Lt. C. Martinez.

## F.    Deliberate Indifference to Serious Medical Needs

Plaintiff alleges that, after he was beaten by multiple officers, he was taken to medical. However, Nurse Shantel Reyna refused to treat him because she believed he had attacked an officer. (ECF No. 14, p. 16).

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). This requires a plaintiff to show (1) "a 'serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) that "the defendant's response to the need was deliberately indifferent." *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992) (citation and internal quotations marks omitted), *overruled on other grounds by WMX Technologies v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)).

Deliberate indifference is established only where the defendant subjectively "knows of and disregards an excessive risk to inmate health and safety." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (citation omitted). Deliberate indifference can be established "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett*, 439 F.3d at 1096 (citation omitted). Civil

recklessness—failure "to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known"—is insufficient to establish an Eighth Amendment violation. *Farmer v. Brennan*, 511 U.S. 825, 836-37 & n.5 (1994) (citations omitted).

A difference of opinion between an inmate and prison medical provider—or between medical professionals—regarding appropriate medical diagnosis and treatment is not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Additionally, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106.  "Rather, to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Toguchi*, 391 F.3d at 1058 (alterations in original) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

Here, Plaintiff alleges serious injuries that would have been visible following the incidents in which he was sprayed with pepper spray and beaten by multiple officers. Among other things, Plaintiff states that his face was swollen, his nose was broken, and the back of his head was busted open and required seven staples to close. However, rather than indicating any medical rationale to justify not treating Plaintiff, Nurse Shantel Reyna allegedly stated that she would not treat him because he purportedly attacked an officer.

With the above standards in mind, the Court concludes, for the purposes of screening, that Plaintiff has stated a claim for deliberate indifference to serious medical needs against Nurse Shantel Reyna.

### G.    Threats

Plaintiff complains about multiple threats. He asserts that Officer Gannon threatened to get him after Plaintiff assisted Inmate Hearn with his grievance proceedings. He claims that T. Burns threatened to get him in reference to the January 6, 2021 incident. He states that Lt. C.

Martinez threatened him if he did not recant his version of events about the alleged attack he experienced at the hands of multiple officers. He appears to assert that Dr. Wang, CCI's Warden, Officer Gannon, Officer Levinson, Officer Sims, Officer Molina, and Officer Hunt were involved (or at least complicit) in threats about using force if he did not agree to give a blood sample. And he states that Officer Munoz made a threat implicating his murder, and Officer Pena and CCI's Warden were complicit.

Allegations of name-calling, verbal abuse, or threats generally fail to state a constitutional claim under the Eighth Amendment, which prohibits cruel and unusual punishment. *See Keenan v. Hall*, 83 F.3d 1083, 1092 (9th Cir. 1996) ("[V]erbal harassment generally does not violate the Eighth Amendment."), *opinion amended on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998); *see also Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987) (holding that a prisoner's allegations of threats allegedly made by guards failed to state a cause of action). Even in cases concerning "abusive language directed at [a plaintiff's] religious and ethnic background, 'verbal harassment or abuse is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983.'" *Freeman v. Arpaio*, 125 F.3d 732, 738 (9th Cir. 1997) (quoting *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987)) (alterations omitted), *abrogated on other grounds by Shakur v. Schriro*, 514 F.3d 878 (9th Cir. 2008).

However, verbal harassment may violate the constitution when it is "unusually gross even for a prison setting and [is] calculated to and [does] cause [plaintiff] psychological damage." *Cox v. Kernan*, 2019 WL 6840136, at *5 (E.D. Cal. Dec. 16, 2019) (alterations in original) (quoting *Keenan*, 83 F.3d 1083 at 1092). Notably, "[a] threat of deadly force made merely to inflict gratuitous fear and punishment when the party has both the opportunity to carry out the threat and evidences the intent to do so does state a cognizable claim under the Eighth Amendment." *Monroe v. Mortell*, No. 2:19-CV-2218-WBS-DMC-P, 2022 WL 624996, at *7 (E.D. Cal. Mar. 3, 2022), *report and recommendation adopted*, 2022 WL 1004715 (E.D. Cal. Apr. 4, 2022).

Under the standards above, the Court concludes that Plaintiff fails to state any claim based on the alleged threats. As to Officer Gannon, while the Court has allowed an excessive-

force claim to proceed based his alleged attack on Plaintiff, the threat itself is not cognizable.

Accordingly, to Plaintiff, Officer Gannon made a comment about "getting him." This

ambiguous threat cannot be said to be unusually gross for even a prison setting, nor are there

facts indicating that Plaintiff suffered psychological damage from the threat alone. *See*

*Ferguson v. Pagati*, No. CV 12-00653-VBF-DTB, 2013 WL 3989426, at *5 (C.D. Cal. Aug. 1,

2013) ("The FAC contains no allegations as to what specific threats were allegedly made by

defendant, only that defendant 'began to shout threats of physical violence and threats to

physically harm [p]laintiff while [p]laintiff was in a serious medical crisis.' Moreover, as best

the Court can discern, plaintiff's allegations concern a single instance of verbal threats by

defendant. The allegations do not state defendant's purported threats were unusually harsh

'even for a prison setting,' and there is no mention as to whether or not the alleged statements

were calculated to damage plaintiff, nor as to how defendant was in a position to calculate such

damage.") (internal citations omitted). The same analysis applies to T. Burns, whom Plaintiff

similarly accused of stating, "We go get you."

As to Lt. C. Martinez, he claims that he generally threatened to "attack [Plaintiff]

again." But once again, while this allegation supports other cognizable claims, it in itself is

insufficient to support a § 1983 claim. Most notably, the reference to attacking Plaintiff is too

vague to state a claim. Moreover, Plaintiff does not indicate that it caused him psychological

damage. Rather, by his own telling, he was defiant in the face of Lt. C. Martinez's threat and

refused to recant his claim that he was attacked by officers.

Additionally, Plaintiff's assertions that Dr. Wang, CCI's Warden, Officer Gannon,

Officer Levinson, Officer Sims, Officer Molina, and Officer Hunt were involved (or at least

complicit) in threats about using force if he did not agree to give a blood sample, do not state a

claim. Plaintiff identifies no specific threat and does not explain how he was psychologically

damaged. Rather, according to him, he refused to give blood despite the threats.

Plaintiff's final alleged threat—that Officer Munoz said, "If not for the cameras we will

kill this nigger"—is the most serious. However, under the stringent standards above, Plaintiff

fails to state a claim against Munoz, Officer Pena, and CCI's Warden, the latter two who were

allegedly "complicit" by failing to take action as to the threat. Notably, Plaintiff provides no facts indicating that there was an intent to actually carry out this threat and how Plaintiff was psychologically damaged by the comment.

Accordingly, based on the above standards in mind, the Court concludes that Plaintiff fails to state any constitutional claims regarding the threats made against him.

### H.   Malicious Prosecution

Plaintiff alleges that District Attorney Jamila Ha prosecuted his "case knowing what the officers did by video evidence and claimed said didn't happen." (ECF No. 14, p. 14). These allegations reasonably implicate a claim for malicious prosecution.

"Federal courts rely on state common law for elements of malicious prosecution." *Mills v. City of Covina*, 921 F.3d 1161, 1169 (9th Cir. 2019).

> California law requires a plaintiff claiming malicious prosecution to establish "that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor; (2) was brought without probable cause; and (3) was initiated with malice.'" Additionally, to maintain a § 1983 action for malicious prosecution, "a plaintiff 'must show that the defendants prosecuted [him] . . . for the purpose of denying [him] equal protection or another specific constitutional right.'"

*Id.* (citations omitted).

However, as Plaintiff is attempting to sue a prosecutor, the Court must address prosecutorial immunity. The Ninth Circuit explained this immunity as follows:

> Absolute immunity is generally accorded to judges and prosecutors functioning in their official capacities. *Stump v. Sparkman,* 435 U.S. 349, 364, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) (holding that state circuit judge is immune from suit for all actions within his jurisdiction); *Imbler v. Pachtman,* 424 U.S. 409, 430–31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (holding that state prosecutor had absolute immunity for initiation and pursuit of criminal prosecutions, including presentation of case at trial). This immunity reflects the long-standing "general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." *Bradley v. Fisher,* 13 Wall. 335, 347, 20 L.Ed. 646 (1871).
>
> Recognizing these considerations, courts have extended the protections of absolute immunity to qualifying state officials sued under 42 U.S.C. § 1983. *Miller v. Gammie,* 335 F.3d 889, 895-96 (9th Cir.2003) (explaining that though

19

1
2
3
4
5
6
7
8
9

> § 1983 does not include a defense of immunity, "the Supreme Court has recognized that when Congress enacted § 1983, it was aware of a well-established and well-understood common-law tradition that extended absolute immunity to individuals performing functions necessary to the judicial process" (citing *Forrester v. White,* 484 U.S. 219, 225–26 (1988) (superseded by statute))); *Buckley v. Fitzsimmons,* 509 U.S. 259, 268–69, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). Indeed, judicial immunity from § 1983 suits is "viewed as necessary to protect the judicial process." *Burns v. Reed,* 500 U.S. 478, 485, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991). Likewise, the protections of absolute immunity accorded prosecutors reflect the "'concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust.'" *Id.* (quoting *Imbler,* 424 U.S. at 423, 96 S.Ct. 984).

10
11
12
13

*Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 922-923 (9th Cir. 2004); *see also Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003) ("A state prosecutor is entitled to absolute immunity from liability under § 1983 for violating a person's federal constitutional rights when he or she engages in activities intimately associated with the judicial phase of the criminal process.") (citation and internal quotation marks omitted).

14
15
16
17
18
19
20
21

Here, Plaintiff alleges that District Attorney Jamila Ha improperly prosecuted his attempted murder case despite being aware of certain exculpatory information, including that contained in unspecified "video evidence." Because these allegations stem from District Attorney Jamila Ha's actions as prosecutor in Plaintiff's criminal case, District Attorney Jamila Ha is entitled to absolute immunity from this claim based on the legal standards above. *See Milstein v. Cooley*, 257 F.3d 1004, 1008 (9th Cir. 2001) (noting that prosecutorial "immunity covers the knowing use of false testimony at trial, the suppression of exculpatory evidence, and malicious prosecution").

22

## V.   CONCLUSION AND FINDINGS AND RECOMMENDATIONS

23
24
25
26
27
28

The Court has screened Plaintiff's complaint and has found cognizable the claims listed below. The Court will recommend that any other claims and Defendants be dismissed without further leave to amend. Notably, Plaintiff has already filed an amended complaint as a matter of right. Moreover, despite being given the opportunity to file an amended complaint, he has notified the Court that he wants to proceed on this complaint.

20

Accordingly, IT IS RECOMMENDED as follows:

1. This case proceeds on the following claims:

- for excessive use of force against (1) Officer Gannon, (2) Officer Levinson, (3) Sgt. Cody Williams, (4) Officer Jesse Diaz, and (5) Officer J. Rivas;

- for retaliation against (1) Officer Gannon, (2) Officer Levinson, and (3) Lt. C. Martinez;

- for conspiracy against (1) Officer Gannon, (2) Officer Levinson, and (3) Lt. C. Martinez; and

- for deliberate indifference to serious medical needs against Nurse Shantel Reyna.

2. All other claims and Defendants be dismissed without further leave to amend.

These findings and recommendations will be submitted to the United States district judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within thirty (30) days after being served with these findings and recommendations, Plaintiff may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Plaintiff is advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:  **April 19, 2024**        _____
                                                            /s/ *Erica P. Grosjean*
                                                            UNITED STATES MAGISTRATE JUDGE